USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/6/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
NEW YORK HOTEL & MOTEL TRADES
COUNCIL, AFL-CIO,

          *Petitioner*,

    -*against*-

CHELSEA GRAND LLC,

          *Respondent*.
------------------------------------------------------------- x

17-cv-04444 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Chelsea Grand LLC ("Chelsea") seeks to vacate a 2017 arbitral award ("2017 Award") issued by the Office of the Impartial Chairperson ("OIC") in favor of the New York Hotel & Motel Trades Council, AFL-CIO (the "Union"). The Union cross-moves to confirm of the 2017 Award. For the reasons set forth below, the Court denies Chelsea's motion to vacate the 2017 Award and grants the Union's motion to confirm the 2017 Award.

## BACKGROUND

This dispute is the latest in over a decade of strife between Chelsea and the Union. The Union represents hotel workers in New York City. An Industry-Wide Agreement ("IWA") between the Union and the Hotel Association of New York City ("HANYC") obligates hotel owners and managers to provide the Union access to employees, to permit the Union to organize employees through a card check process, and to remain neutral throughout the union organizing process, and it provides that the Office of Impartial Chairperson ("OIC") will arbitrate any disputes arising out of the agreement. In 2003, Chelsea obtained a franchise for the Four Points Sheraton Hotel (the "Hotel"), located on West 25th Street in Manhattan. In 2007, the Union sought to represent the employees of the Hotel by obtaining authorization cards from a majority

of the Hotel's employees and submitting them to the Impartial Chairperson ("IC") for verification. Chelsea resisted the Union's attempts to represent the Hotel's employees.

This initiated a series of arbitration awards against Chelsea rendered by the IC, confirmed by the Court, and affirmed by the Second Circuit. In *Chelsea I*, the Court concluded that Chelsea was bound by the terms of the IWA through its contract with Interstate and must pay damages for violating it. In *Chelsea II*, the Court concluded that Chelsea must pay damages for subsequent violations of the IWA, and remanded the matter to the IC to calculate damages. The current dispute involves the amount of damages awarded by the IC on remand. A more detailed procedural history follows.

I. *Chelsea I*

In February 2003, Chelsea entered into a Hotel Management Agreeement ("HMA") with Interstate Hotel & Resorts, Inc. ("Interstate") to act as the manager of the Hotel. *Chelsea Grand, LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, No. 07-cv-2614, 2014 WL 4813028, at *3 (S.D.N.Y. Sept. 29, 2014) (*"Chelsea I"*). On January 15, 2004, Interstate entered into a Memorandum of Agreement ("2004 MOA") with the Union. *Id.* at *6. Interstate agreed to be bound by the Accretion and Card Count/Neutrality provisions of a Memorandum of Understanding dated June 15, 2000 ("2000 MOU") between the Union and the HANYC. *Id.* The 2004 MOA took retroactive effect on July 1, 2001 and had no expiration date. *Id.*

The 2000 MOU modified the terms of the IWA between the Union and HANYC. *See id.* at *2. The Card Count/Neutrality provision of the 2000 MOU was incorporated into the IWA as Addendum IV, which sets forth the procedure for the Union to try to organize the employees of a hotel to which the Union does not have representational rights. *See id.* at *2; IWA, Saltzman Decl. Ex. A, at 87-90. Addendum IV also includes an arbitration clause, which provides that the

2

Impartial Chairperson ("IC") "will resolve any and all disputes of any kind whatsoever arising out of this Agreement, or concerning the meaning or interpretation of any and all matters discussed herein." IWA at 87.

In 2007, the Union sought to organize the Hotel pursuant to the Card Count/Neutrality provision. *Chelsea Grand LLC v. N.Y. Hotel & Motel Trades Council, AFC-CIO*, 629 F. App'x. 152, 153 (2d Cir. 2015) ("*Chelsea I*"). Chelsea resisted, and the Union commenced an arbitration proceeding against Chelsea before the IC. *Id.* at 153. The IC issued two awards finding Chelsea in violation of its obligations under the 2004 MOA, reasoning that Chelsea was bound to the 2004 MOA because it was a joint employer and principal to Interstate. *Id.* As a result of Chelsea's "intentional violation of the IWA," the IC awarded the Union punitive damages in the amount of $35,500 per day, representing the average daily gross amount Chelsea would receive from its rooms, until Chelsea complied with the awards. *Chelsea I* Compl. Ex. B, Dkt. 1-3, at 20-21.

Chelsea then challenged the arbitral proceedings pursuant to New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") Article 75. *Chelsea I*, 2014 WL 4813028, at *1. The action was removed to federal court, and this Court confirmed the arbitral awards, finding Chelsea bound to Interstate's commitments under theories of joint employer and apparent agency. *Chelsea I*, 629 F. App'x. at 154. Chelsea appealed, and the Second Circuit affirmed, explaining that the Card Check/Neutrality provision of the 2001 IWA was applicable to Chelsea through the 2004 MOA. *Id.* at 155. Thereafter, Chelsea satisfied the judgment by paying the $35,500 per day penalty to the Union. *See Chelsea I* Dkt. 172, Satisfaction of Judgment.

3

## II. *Chelsea II*

While *Chelsea I* was pending, the IC conducted a card count and certified that a majority of eligible employees had designated the Union as their collective bargaining representative. *Chelsea Grand LLC v. New York Hotel & Motel Trades Council, AFL-CIO*, No. 16-cv-5301, 2017 WL 1102699, at *2 (S.D.N.Y. Mar. 23, 2017) ("*Chelsea II*"). The Union then made additional arbitration demands on Chelsea under Addendum IV, alleging unfair labor practices. *Id.* After 11 days of hearings, supplemented by post-hearing and reply briefs, the IC issued an award on April 14, 2008 ("2008 Award"), in which the IC found in favor of the Union with respect to certain unfair labor practice allegations, and against the Union with respect to others. *Id.*

To remedy the effects of Chelsea's unlawful practices, the IC directed Chelsea to pay applicable employees "the minimum hourly wage rates, and fringe benefits . . . contained in the Collective Bargaining Agreement between the Union and the Wingate Hotel, until the sooner of the execution of a Collective Bargaining Agreement between the Hotel and the Union, or the expiration date of the aforementioned Wingate Hotel Collective Bargaining Agreement." 2008 Award, Konkel Decl. Ex. B, at 57-58. He also directed that Chelsea would "be bound by all of the other provisions of the [IWA]" for the same duration of time. *Id.* at 58. With respect to these remedies, the IC "retain[ed] jurisdiction should there arise any dispute with regard to application, entitlement, or the amount due bargaining unit employees." *Id.* The 2008 Award was neither vacated nor confirmed.

Following *Chelsea I*, the Union tried to negotiate with Chelsea for a collective bargaining agreement, and served a Request for Information ("RFI") on Chelsea. *Chelsea II*, at *2. Chelsea failed to produce all the requested information. *Id.* On January 11, 2016, the Union demanded

4

arbitration regarding (1) Chelsea's failure and refusal to produce documents and information requested in the RFI, and (2) Chelsea's refusal to honor obligations under the 2008 Award. *Id.* An arbitration hearing was held on February 24, 2016, and the IC issued an award relating to these two issues on May 10, 2016 ("2016 Award"). *Id.*

In the 2016 Award, the IC noted that Chelsea claimed "employee privacy" at the February 24, 2016 hearing as a reason for its refusal to provide the employee contact information requested by the Hotel Workers Union in its RFI. 2016 Award, Konkel Decl. Ex. C, at 3-4. The IC found Chelsea's argument to "border[ ] on being frivolous," and stated that he ruled orally at the February 24, 2016 hearing "that such information was to be provided to the Union." *Id.* Because Chelsea had not provided the requested information after the February 24, 2016 hearing, the IC directed Chelsea to pay the Union $2,698,000 in punitive damages plus an additional $35,500 for each day that it failed to comply with the RFI. *Id.* at 11. As for the 2008 Award, the IC concluded that it was "viable and enforceable and the Union [was] entitled to all of the relief it [had] requested." *Id.* at 11. He directed a hearing to be held to determine the amounts due to various employees and found "that the status quo ante for wages and fringe benefits for . . . when the parties recommenced collective bargaining . . . is the current terms and conditions contained in the current Wingate Collective Bargaining Agreement." *Id.*

In *Chelsea II*, the Court denied Chelsea's petition to vacate the 2016 Award and confirmed the award instead. *Chelsea II*, 2017 WL 1102699, at *1. The Court's subsequent Order and Judgment directed the parties to return to the IC for determination of the monetary amounts due to "bargaining unit members, the Union and the Funds" under the 2016 Award. *Chelsea II*, Dkt. 44. The Second Circuit affirmed the Court's order confirming the 2016 Award

5

on April 3, 2018. *Chelsea Grand, LLC v. New York Hotel & Motel Trades Council, AFL-CIO*, 729 F. App'x 33 (2d Cir. 2018) ("*Chelsea II*").

### III. 2017 Award

On July 20, 2017, the IC held a hearing on amounts due under the 2016 Award. *See* 2017 Award, Konkel Decl. Ex. A, at 1-2. Both parties submitted extensive documentation in support of their positions, argued their positions vigorously at the hearing, and submitted written post-hearing briefs. *Id.* at 2. The IC issued the resulting 2017 Award on September 29, 2017.

In the 2017 Award, the IC calculated that Chelsea owed its present and former employees $6,140,668.37 in back wages and $907,025.43 in interest using the National Labor Review Board ("NLRB") rate of 4%, for a total of $7,047,693.80. *Id.* at 38-40, 43, 45. The IC found that Chelsea owed contributions to the Union's employee benefit funds ("Funds") in the amount of $3,925,496.18 plus 4% NLRB interest of $89,229.98 for a total of $4,014,726.16. *Id.* at 39, 45. Lastly, the IC calculated the $35,500 per day in punitive damages owed to the Union for the RFI violations to be $4,402,000, as Chelsea produced the bulk of the information requested in the RFI by June 27, 2016. *Id.* at 43, 45. Thus, the IC found that Chelsea owed a total of $15,464,419.96 in damages. *Id.* at 45.

Chelsea now moves to vacate the 2017 Award, arguing that it exhibits "manifest disregard for established principles of law." Chelsea Br., Dkt. 18, at 1.

## DISCUSSION

### I. Legal Standard

"Under the N.Y. C.P.L.R., a court must confim an award upon timely motion unless it is vacated, modified, or corrected." *Chelsea II*, 2017 WL 1102699, at *3 (quotation omitted). A party seeking to vacate an award on the basis of manifest disregard of the law must show that

"(1) the arbitrator knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator was well-defined, explicit, and clearly applicable to the case." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110-11 (2d Cir. 2006). Thus, courts "will not vacate an award because of a simple error in law or a failure by the arbitrators to understand or apply it but only when a party clearly demonstrates that the [arbitrator] intentionally defied the law." *STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2006) (quotation omitted).

Moreover, "a federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential—indeed, among the most deferential in the law." *N.Y.C. & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of New York, Inc.*, 826 F.3d 611, 618 (2d Cir. 2016). The court's "very limited" duty "is simply to determine whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." *Id.* (quotation omitted). As long as "the arbitrator was even arguably construing or applying the contract language and acting within the scope of his authority and did not ignore the plain language of the contract, the award should ordinarily be confirmed." *Id.*

## II. Analysis

Chelsea posits three reasons for vacating the 2017 Award: (1) payment of damages to the Union and the Funds would be unlawful under Section 302(a) of the Labor Management Relations Act ("LMRA"); (2) the amount of damages exceeds the scope of available relief under the IWA and the 2008 Award; and (3) the 2017 Award is entirely punitive in nature and therefore offends the National Labor Relations Act ("NLRA"). Chelsea's Reply Brief, submitted after the Second Circuit's decision in *Chelsea II*, focuses solely on its argument that the payment

7

of damages to the Funds would be unlawful under the LMRA. Nevertheless, the Court will address each of these three arguments.

### A. LMRA Section 302

Chelsea argues that the IC exhibited manifest disregard for the law because Section 302 of the LMRA prohibits employers from making any direct payment "to any labor organization" or "employee representative," and because none of the exceptions listed in Section 302(c) allows either the Union or the Funds to receive damages from Chelsea. *See* 29 U.S.C. § 186(a), (c)(5)(B). This is a too cramped interpretation of § 302. In *Chelsea II*, however, the Second Circuit affirmed confirmation of the 2016 Award, which clearly contemplated Chelsea paying the Union "monetary and punitive damages" for Chelsea's RFI violations. *See Chelsea II*, 729 F. App'x at 39-40; 2016 Award at 11. Indeed, arbitration awards ordering an employer to pay damages to a union for past labor violations fall within Section 302(c)(2)'s exception for "payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman." 29 U.S.C. 186(c)(2); *see also Ecoline, Inc. v. Local Union No. 12 of Int'l Ass'n of Heat & Frost Insulations & Asbestos Workers AFL-CIO*, No. 05-cv-2661, 2006 WL 252 4179, at *6 (S.D.N.Y. Aug. 30 2006) ("[C]ourts applying section 186(c)(2) have 'interpreted the exception to encompass arbitration awards that require the employer to directly pay the union for past violations.'" (citations omitted), *aff'd* 271 F. App'x 70 (2d Cir. 2008). Thus, Chelsea's argument regarding direct payments to the Union is unavailing.

In its Reply Brief, however, Chelsea maintains that payments to the Funds would violate Section 302 because such payments fall within the ambit of Section 302(c)(5), not (c)(2), and require the existence of a written agreement between the parties that governs benefit

8

contributions. *See* 29 U.S.C. 186(c)(5) (creating exception "with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer," so long as "the detailed basis on which such payments are to be made is specified in a written agreement with the employer"). Chelsea relies on *International Longshoremen's Association v. Seatrain Lines*, in which the Second Circuit noted that "contributions to union welfare funds which have been made pursuant to . . . an arbitration award, and might therefore be thought to fall within the exceptions of Section 302(c)(2), are to be scrutinized under the standards set out in Section 302(c)(5)." 326 F.2d 916, 920 (2d Cir. 1964). Chelsea contends that the arbitration award must be vacated because the Union fails to identify a written agreement that satisfies Section 302(c)(5).

Chelsea, however, never made this Section 302 argument before the IC. Chelsea was well aware that the IC was contemplating awarding damages to the Funds, as this Court directed the parties to return to the IC for the express purpose of determining the amounts due to "bargaining unit members, the Union and the Funds." *Chelsea II*, Dkt. 44, Order and Judgment. Nevertheless, Chelsea did not argue to the IC that any damages awarded to the Funds would be unlawful under Section 302. Rather, it argued that (1) the IC could not calculate damages using NLRB policy or Section 198 of the New York Labor Law as guidance; (2) the 2008 Award limited damages to wages and benefits that accrued through June 2012; (3) the Union's demand for Section 198 damages and NLRB interest is time-barred; (4) the IC's prior award of $35,500 per day in punitive damages must be reversed as exceeding what the IWA allows; and (5) Section 198 and NLRB damages are not warranted. 2017 Award at 29-37. Hence, even assuming that the rule enunciated in *Seatrain* was "well-defined, explicit, and clearly applicable to the case," it cannot be said that the IC "knew of a governing legal principle yet refused to

9

apply it." See *D.H. Blair & Co.*, 462 F.3d at 110-11. Accordingly, the Court will not vacate the 2017 Award on this basis.

**B.     Excessive Damages**

Chelsea next argues that the IC exceeded his authority under the IWA by awarding NLRB interest in the amount of 4% for back wages owed to employees and the Funds and by awarding punitive damages in the amount of $35,500 per day through June 26, 2016. Chelsea points to Article 26(L) of the IWA, which states as follows:

> Effective for instances which arise after the effective date of this Agreement, an EMPLOYER found by the Impartial Chairperson to have (1) shown a pattern of repeated violations of a similar type and nature which supports a finding of intentional and bad faith contract violation; or (2) willfully violated a clearly defined contractual provision or hotel-specific established practice relating to scheduling, layoff, recall, wage or a wage-related provision, and that in either case above, i.e., (1) or (2), where such violation has resulted in a monetary award to the affected employees the Impartial Chairperson shall award to such employees an additional amount equal to fifteen percent (15%) of the awarded amount. It is understood that this provision shall not apply to situations where the Impartial Chairperson finds that the EMPLOYER has relied upon a good faith interpretation of the Agreement(s).

IWA at 21. Based on this language, Chelsea contends that the IC could award as punitive damages only 15% of the total amount awarded in the 2017 Award, not 4% interest on back wages pursuant to NLRB standards or $35,500 per day for failure to respond to the RFI.

Nothing in Article 26, however, suggests exclusivity. Rather, it provides a particular remedy for two types of violations. As the IC recognized, the Union initiated the proceedings under Addendum IV, which contains broader remedial language:

> [T]he Impartial Chairperson shall be empowered to issue such remedial orders *as are consistent with applicable NLRB standards* and necessary during and after the pendency of the Union's organization drive to ensure the maintenance of the neutral environment and/or to penalize the Hotel or the Union for violating their obligations hereunder, including an order to bargain in accordance with applicable NLRB standards, *and/or monetary or punitive damages to either party*.

10

IWA at 89 (emphasis added). Thus, the IC was at least "arguably construing or applying the contract language" by concluding that Addendum IV authorized the punitive damages and NLRB interest that he awarded. *See N.Y.C. & Vicinity Dist. Council*, 826 F.3d at 618. Indeed, the Second Circuit reached the same conclusion in *Chelsea II* with respect to the award of punitive damages. *See* 729 F. App'x at 39 ("The arbitrator was likewise arguably construing or applying the contract within the scope of his authority when he awarded monetary and punitive damages for Chelsea Grand's non-compliance with the Union's RFI. Addendum IV to the IWA unambiguously authorized 'monetary or punitive damages,' and the arbitrator was charged with the mandate to determine a proper remedy." (internal citations omitted)). Chelsea's repackaged argument fares no better simply because it now includes NLRB interest and precise monetary figures. The IC did not exceed the scope of his authority by granting this relief.

Chelsea also argues that that the IC exceeded his authority by acting contrary to his own 2008 Award. The 2008 Award stated Chelsea must pay all bargaining unit employees:

> the minimum hourly wage rates, and fringe benefits, including but not limited to contributions to the Union Medical Fund, contained in the Collective Bargaining Agreement between the Union and the Wingate Hotel, until the sooner of the execution of a Collective Bargaining Agreement between the Hotel and the Union, or the expiration date of the aforementioned Wingate Hotel Collective Bargaining Agreement.

2008 Award at 57-58. Chelsea contends that because the Wingate Agreement expired on June 30, 2012, the IC could not award wage damages based on conduct occurring after that date.

As an initial matter, Chelsea points to no authority suggesting that an arbitrator's previous, unconfirmed award controls a subsequent award. In any event, the IC, this Court, and the Second Circuit have already considered and rejected Chelsea's interpretation of the 2008 Award. In the 2016 Award, the IC found that, despite this language in the 2008 Award, Chelsea must continue paying the rates contained in the current Wingate Agreement until Chelsea

11

reached its own collective bargaining agreement, as a remedy for Chelsea's noncompliance with the 2008 Award. 2016 Award at 10. This Court confirmed the 2016 Award, and the Second Circuit affirmed, holding that the IC did not exceed his authority because "the arbitrator did not impose upon Chelsea Grand the terms of a finalized collective-bargaining agreement. Rather, . . . the Wingate Agreement terms are inherently temporary; they shall expire once the parties have completed the collective-bargaining process in good faith and arrived at their own contractual terms, or until they have reached a *bona fide* impasse." *Chelsea II*, 729 F. App'x at 38-39 (citations and alterations omitted). Thus, it follows that the IC did not exceed his authority by awarding wage damages for the time period following June 2012.

## C. Punitive Nature

Finally, Chelsea argues that the 2017 Award must be vacated because "all the remedies imposed and embodied in the Award are punitive and confiscatory in nature, and not for any compensatory purpose." Chelsea Br., Dkt. 18, at 18. Chelsea contends that "[t]he Supreme Court has made clear that the NLRA prohibits the type of punitive damages scheme sought and delineated in the Award." *Id.* at 17.

The cases that Chelsea cites, however, prohibit only punitive damages issued by the NLRB or a court for violations of a statute, not punitive damages issued by the OIC for violations of a contract that expressly authorizes them. *See, e.g., Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 901 (1984) ("[T]he Court of Appeals' award of a minimum amount of backpay in this case is not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees."). The Second Circuit, however, has already affirmed the same remedy of $35,500 per day in punitive damages in *Chelsea I*, 629 F. App'x at 156, and it affirmed the IC's award of "monetary and punitive damages" in *Chelsea II*, 729 F. App'x at 39, because the IWA authorized

such relief. Moreover, as with Chelsea's Section 302 argument, Chelsea never argued to the IC that an award of punitive damages would be unlawful. Therefore, the IC did not act in manifest disregard of the law, and the Court declines to vacate the award.

**D.   Prejudgment Interest**

The Union also requests prejudgment interest of 9% per annum from the date of the 2017 Award, September 29, 2017, through the date of judgment. There is a "presumption in favor of prejudgment interest" for arbitration awards. *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984). "Following this rationale, district courts within the Second Circuit have exercised their discretion to award prejudgment interest when confirming arbitration awards under collective bargaining agreements pursuant to § 301 of the LMRA, when the CBAs indicated that an arbitration award was 'final and binding.'" *SEIU v. Stone Park Assocs., LLC*, 326 F. Supp. 2d 550, 555 (S.D.N.Y. 2004). Here, the IWA specifies that "[a]ny arbitration award or decision issued by the Impartial Chairperson, written or otherwise, shall be final and binding upon the parties." IWA at 88. Thus, the Court finds that an award of prejudgment interest is appropriate. The Court also finds that a rate of 9% per annum is appropriate. *See SEIU*, 326 F. Supp. 2d at 555 ("[T]he 'common practice' among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law . . . .").

## CONCLUSION

For the reasons stated above, Chelsea's motion to vacate the 2017 Award is DENIED, and the Union's motion to confirm the 2017 Award is GRANTED. The Clerk of Court is directed to close the motions at Dkt. 16 and 21. The Clerk is further directed to enter judgment in favor of the Union and against Chelsea in the amount of $15,464,419.96, to be paid in

13

accordance with the 2017 Award: $4,402,000 to the Union, $4,014,726.16 to the Funds, and $7,047,693.80 to the employees, plus prejudgment interest of 9% per annum on each of these amounts from September 29, 2017 through the date of judgment. Because the complaint in this case relates to a different award issued by the IC, however, the Clerk is not directed to close the case at this time.

Dated: New York, New York
September 6, 2018

SO ORDERED

*[signature]*
PAUL A. CROTTY
United States District Judge